## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

**RHINA SARAVIA**, *et al.*    )
            )
    **Plaintiffs,**   )
            )
    **v.**       )   **Civil Action No. WGC-10-832**
            )
**DE YUE CHEN**, *et al.*    )
            )
    **Defendants.**  )
_____)

### MEMORANDUM OPINION

Plaintiffs Rhina Saravia, Rosa Maria Gamez and Phillip R. Murray, Esquire (as Personal Representative of the Estate of Decedent, Jose Fernando Gamez) (hereinafter the "Plaintiffs") brought this action against De Yue Chen and New Century Travel, Inc. (hereinafter the "Defendants") alleging negligence and wrongful death as a result of a fatal accident on February 10, 2009.   The parties consented to proceed before a United States Magistrate Judge for all further proceedings in the case and the entry of a final judgment.  *See* ECF Nos. 27-28.  Pending before the Court and ready for resolution is Defendants' Motion for Summary Judgment (ECF No. 79).  Plaintiffs have moved for leave to file a sur-reply (ECF No. 90) which Defendants oppose (ECF No. 91).  Finding that the issues have been fully briefed and further finding that Defendants' Reply raises no new issues, the Court **DENIES** Plaintiffs' Motion for Leave to File Sur-Reply (ECF No. 90).   No hearing is necessary with regard to Defendants' Motion for Summary Judgment and the Court now rules pursuant to Local Rule 105.6 (D. Md. 2011).

## BACKGROUND[1]

On February 10, 2009 the decedent Jose Fernando Gamez ("Mr. Gamez") purchased a propane grill at Lowe's on Riverdale Road in New Carrollton, Maryland.[2]  The propane grill was secured with yellow rope in the bed of Mr. Gamez's Nissan Frontier pickup truck.  Sometime thereafter Mr. Gamez departed Lowe's and presumably was driving to his home in the District of Columbia by taking the Baltimore Washington Parkway, in the southbound direction.  At some point during this trip the method of securing the propane grill inside the bed of the pickup truck failed.  When the propane grill bounced from inside the bed of the pickup truck, the propane grill hit the road leaving two parallel gouges in the pavement of the right lane.  At this point in time the propane grill was dangling partially out of the pickup truck but was suspended in place by the rope.  Sometime thereafter, as Mr. Gamez continued driving, three metal pieces of the propane grill fell on the pavement landing in both the right and left southbound lanes.  ECF No. 79-4 (Bentivenga Dep. 29:13–30:6).[3]

Sometime thereafter, about 7:30 p.m., Mr. Gamez stopped his pickup truck in the right southbound lane.  The two street lights were not functioning in the area where Mr. Gamez stopped.  Mr. Gamez turned on his hazard lights and then apparently stepped out of his pickup truck, walking to the rear passenger side.

---

[1]  In determining whether the moving party has shown there are no genuine issues of any material fact, this Court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).

[2]  Q:  You state that Mr. Gamez had recently picked up a propane grill at Lowe's on Riverdale Road in New Carrollton.
      Where did that information come from?
   A:  There was a receipt.

ECF No. 79-4 (Bentivenga Dep. 54:17-21).

[3] In citing the parties' briefs, the Court uses the pagination as displayed on CM/ECF.

Zerihun Diriba ("Mr. Diriba") was driving a Nissan Sentra in the right southbound lane along the Baltimore Washington Parkway. Mr. Diriba saw a vehicle in the distance in front of him. At first he assumed the vehicle was moving at a slow speed. As he got closer Mr. Diriba realized the vehicle was completely stopped. Mr. Diriba adjusted the speed of his vehicle by slowing down. The pickup truck's hazard lights were on. The area was dark. As Mr. Diriba got a better view of the pickup truck he noticed "it was just parked in the middle of the right lane."[4] ECF No. 79-5 (Diriba Dep. 12:15-16); ECF No. 83-4 (Diriba Dep. 12:15-16).[5] Mr. Diriba cannot recall the distance between the pickup truck stopped in the road and his vehicle when he started to slow down. Mr. Diriba described the sequence of events:

> A:      [B]ecause I noticed that from a distance, so I started slowing down at reasonable speed, until I get closer to it, so you could say from the ramp. You know, it's dark, so that blinking light, you can see it. The moment it can be visible, I could now guess something is going on in there.
>
> So I cannot give you exactly the distance.
>
> Q:      Okay. So once you saw -- you saw the hazard lights on, on the pickup truck?
>
> A:      Yes.
>
> Q:      Okay. And could you see both hazard lights?
>
> A:      I think so, but I'm not -- I think so. I think so. I could see the hazard lights anyway.
>
> Q:      Okay. And that indicated to you that there was a hazard ahead?

---

[4]  Plaintiffs assert Mr. Gamez "parked his truck in the far right portion of the right lane. . . ." ECF No. 83 at 6. Plaintiffs concede "[t]he first driver to approach Mr. Gamez's truck saw from a distance that the vehicle's emergency lights were flashing and did not observe any cars between himself and the truck." *Id.* at 15 (citation omitted). Since Mr. Diriba had an *unobstructed view* of the pickup truck in front of him, the only evidence about the location of Mr. Gamez's truck is from Mr. Diriba. Mr. Diriba identified the precise location of the parked pickup truck – *in the middle of the right lane.* Plaintiffs fail to present *any* evidence supporting their claim that the parked pickup truck was in the far right portion of the right lane.

[5] ECF No. 83 is Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

A:      There's some kind of.

Q:      Okay.  And so in order to stop, did you have to -- or to slow down, did you have to apply your brakes?

A:      Yes, I did.

Q:      Okay.  Do you know how you applied your brakes, in terms of whether it was whether you pumped them, or just slowly slowed down, or what can you -- please describe as best as you can recall, the manner in which you slowed your car by using your brakes?

A:      Well, it's not like hard stop, like I came down.  I was slowing down.  The first option I was considering at that point was to make a left turn, but as I slowed down, that began really impossible or I would expose myself to other danger.  So I almost decided on -- I mean, just stopping my car behind the pickup truck.  But the speed of the bus kind of warned me, you know, I have to do something.

        So -- but, I couldn't do anything anyway, so I slowed down and then kept my distance, and I kind of just applied -- it's not really a kind of brake you would take when you just accidentally brake, and then it's just a kind of more of slow down and park.  It's not even a -- it's not really hard, hard brake.

        *                          *                          *

        But I realized I cannot make it, and I just kind of brake before I get close to probably when I knew I had enough distance to just stop.

ECF No. 79-5 (Diriba Dep. 23:22 - 25:16, 26:3-5); ECF No. 83-4 (Diriba Dep. 23:22 - 25:16, 26:3-5).

        Once Mr. Diriba realized the pickup truck was stopped on the road, he considered

moving into the left southbound lane, but the flow of traffic in that lane prevented Mr. Diriba

from safely moving from the right southbound lane.  Meanwhile, in his rearview mirror, Mr.

Diriba realized a bus was behind him and that the bus had not adjusted its speed and was rapidly

approaching Mr. Diriba's car from the rear.  ECF No. 79-5 (Diriba Dep. 22:17-22); ECF No. 83-

4

4 (Diriba Dep. 22:17-22).   As a defensive measure Mr. Diriba moved his car toward the left within the right southbound lane behind the pickup truck and then stopped.   ECF No. 79-5 (Diriba Dep. 14:13-17); ECF No. 83-4 (Diriba Dep. 14:13-17).   As Mr. Diriba feared, the bus collided with his vehicle, striking the right rear passenger side of Mr. Diriba's car and pushing Mr. Diriba to the left before the bus turned toward the right shoulder.   ECF No. 79-5 (Diriba Dep. 21:18 - 22:6); ECF No. 83-4 (Diriba Dep. 21:18 - 22:6).   When the bus collided with Mr. Diriba's car, "then [the bus] brushed me off and then [the bus] pushed me to the left edge further."   ECF No. 79-5 (Diriba Dep. 14:2-3); ECF No. 83-4 (Diriba Dep. 14:2-3).

There were no other vehicles between the pickup truck and Mr. Diriba's car, thus Mr. Diriba had an unobstructed view of the pickup truck as he was slowing down.   During the sequence of events leading up to the bus colliding with the right rear passenger side of Mr. Diriba's car, Mr. Diriba did not see any pedestrian on the roadway anywhere.   Further, Mr. Diriba does not recall seeing any vehicle behind him between his Nissan Sentra and the bus.   "I only see the bus is bigger, and it's coming faster, so I just -- I was just only -- my recollection is, if there is any at all, I only remember the bus."   ECF No. 79-5 (Diriba Dep. 33:22 - 34:3); ECF No. 83-4 (Diriba Dep. 33:22 - 34:3).

In addition to Mr. Diriba, Thomas Peters was also operating a motor vehicle, a Volkswagen Golf, in the right southbound lane of the Baltimore Washington Parkway.   Mr. Peters described the sequence of events:

> A:      I was driving and going southbound, and at first I saw something shiny on the road.   So -- like a piece of metal of some sort.   So I saw that.

> *                              *                              *

> It was in the middle of the lane that I was in.

\*                                    \*                                    \*

  So I'm in [the right hand lane], and I see a shiny metal object.  And you know, from there then my eyes go ahead, and I see what I at first thought to be two cars slowing down.

  And then I realized that they weren't really slowing down. That they were stopped.  And when I -- and I was at this point in time quickly coming onto them.

  So I swerved, you know, which was the direction I was going to go anyway and --

\*                                    \*

I swerved to the right.  And at that point in time I -- my vehicle was st[r]uck by something in the rear.  And my car went forward very quickly and it -- you know, then I pulled off on the shoulder.

ECF No. 79-3 (Peters Dep. 13:18-20, 14:1-2, 14 - 15:2, 4-8); ECF No. 83-2 (Peters Dep. 13:18-20, 14:1-2, 14 -15:2, 4-8).

  The two stopped vehicles were a sedan and a small pickup truck.  Although Mr. Peters knew other vehicles were traveling behind him, he could not recall any specific vehicle immediately behind him.  ECF No. 79-3 (Peters Dep. 18:19 – 19:3); ECF No. 83-2 (Peters Dep. 18:19 – 19:3).  When Mr. Peters *swerved* to the right upon realizing the pickup truck and the sedan were stopped, he said he did not drive past those vehicles.  ECF No. 79-3 (Peters Dep. 27:2-5); ECF No. 83-2 (Peters Dep. 27:2-5).

  A: It doesn't feel like I actually went by the cars.  It's not like I swerved slightly.  I swerved, you know, dramatically in such a way that at that point in time I was no longer parallel to those vehicles.  I was more at an angle of, you know, 20 degrees or something like that that took me off to the exit, you know -- or not the exit but the New York Avenue -- so I mean, that's why I think that the accident happened pretty close to that off-ramp if not darn parallel.

ECF No. 79-3 (Peters Dep. 28:13 - 29:1); ECF No. 83-2 (Peters Dep. 28:13 - 29:1).

The sequence of events happened so quickly.  By the time Mr. Peters recognized the two vehicles were stopped, not just slowing down, he adjusted his speed by slowing down and then moved to the right to avoid a collision.

> A:      But I can say that it all happened relatively quickly.  I think I was -- I can say I was aware of the vehicles for sure.  They were in my field of vision.  I can say that I saw a shiny object.  And I know I went through a period of believing that the vehicles were slowing down, and then I realized that those vehicles were not slowing down but that they were stopped.

> *                              *                              *

> I'm sure I slowed down.

> *                              *                              *

> How much did I -- I -- so it wasn't like a full out slam my brakes, you know, kind of thing, 'cause I think that would have put me right into them.  Some -- somewhere along the way I realized that I was not going to be able to slow down in time, or I didn't want to and that's why I swerved, you know.

ECF No. 79-3 (Peters Dep. 46:2-9, 14, 20 - 47:4); ECF No. 83-2 (Peters Dep. 46:2-9, 14, 20 - 47:4).

Being in the right southbound lane, there was not another lane to the right of Mr. Peters. Fortunately for him, the ramp to get off of the Baltimore Washington Parkway was close by so he swerved right in that direction.  Before swerving Mr. Peters was slowing down.  Mr. Peters was so focused on avoiding any collision with the two stopped vehicles ahead that he did not see what struck him from behind.[6]  From this impact Mr. Peters felt a significant push.  This push accelerated his car as he moved to the right.  ECF No. 79-3 (Peters Dep. 49:11 - 51:5); ECF No. 83-2 (Peters Dep. 49:11 - 51:5).

---

[6]  "So at no point in time did I even know that it was behind me.  It might have been in a blind spot.  I don't know. All I can say definitely is I didn't even know it was there."  ECF No. 79-3 (Peters Dep. 50:5-8); ECF No. 83-2 (Peters Dep. 50:5-8).

Mr. Peters was unaware of what struck him until another motorist informed him that he had been hit by a bus.   According to Mr. Peters the bus struck the rear left side of his Volkswagen Golf.  Mr. Peters does not believe the bus was traveling significantly faster than he at the moment of impact.  ECF No. 79-3 (Peters Dep. 55:8-11); ECF No. 83-2 (Peters Dep. 55:8-11).  Between the time Mr. Peters realized the two vehicles in front of him were stopped and the time Mr. Peters swerved to the right, Mr. Peters did not see anyone on the roadway.  ECF No. 79-3 (Peters Dep. 25:11-17); ECF No. 83-2 (Peters Dep. 25:11-17).  After the bus collided with the rear of Mr. Peters' car and propelled the car forward, the Volkswagen Golf came to a stop about 460 feet away (further south) from the area of impact.[7]

De Yue Chen ("Mr. Chen") was operating a Van Hool Tour Bus on behalf of his employer, New Century Travel, Inc., carrying passengers along the Baltimore Washington Parkway traveling southbound.  Mr. Chen was on the Philadelphia to Washington, D.C. route on the evening of February 10, 2009 at approximately 7:30 p.m.  Mr. Chen was familiar with this route, having driven it on 50 or more occasions.  ECF No. 79-6 (Chen Dep. 39:1 – 40:8); ECF No. 83-3 (Chen Dep. 39:1 – 40:8).

As he operated the bus, Mr. Chen did not observe any vehicles slowing down.  What he saw was vehicles stopped on the highway without any warning.

> Q:      I want to ask you to focus on a specific period of time.  I take it that there came a time when you believed that vehicles in front of you had either slowed or stopped; is that correct?
>
> A:      No.  They all stopped together.  It was the car stopped on the highway.
>
> Q:      As you were driving on the Route 50, New York Avenue, ramp at 40 to 50 miles an hour, am I correct in saying that the first

---

[7] Officer Bentivenga, the crash reconstructionist, defined the *area of impact* as the area where the fatality occurred, meaning the rear passenger side of the Nissan Frontier pickup truck.  *See* ECF No. 79-4 (Bentivenga Dep. 113:17–21).

indication that you had that there may have been a problem was that you saw vehicles that were stopped?

A:      I did not see in the beginning.  When everyone stopped, then I saw.

Q:      Am I correct in saying that you did not -- you did not see vehicles slowing down?

A:      No, I did not.

Q:      And that the first time you knew there may have been a problem was when you saw vehicles at a dead stop?

A:      Yes.

Q:      I want to get an understanding of what you were able to see when you determined that vehicles were at a dead stop.  First of all, how far away were the vehicles?

A:      At the time, it's very confusing over there, because all the car was over there, spinning, spinning around on my left, and also on my right.  It happened at the same time.

Q:      Is it your testimony that there were cars out of control as you approached the stopped vehicle?

A:      Yes.  Yes, they were doing an immediate stop.

Q:      When you -- I understand your testimony that you -- there came a time when you saw vehicles that were in a -- at a dead stop in front of you; is that correct?

A:      No.  I did not see.  Everybody stopped all together.  But before that, I did not see cars stop.

Q:      And you cannot recall how far away from those vehicles your vehicle was when you first realized they stopped?

A:      I don't remember.

ECF No. 79-6 (Chen Dep. 53:19 - 55:22); ECF No. 83-3 (Chen Dep. 53:19 - 55:22).

The bus' low beams were on as Mr. Chen drove south along the Baltimore Washington Parkway.  ECF No. 79-6 (Chen Dep. 45:14-17); ECF No. 83-3 (Chen Dep. 45:14-17).  When the

cars in front of him suddenly stopped, Mr. Chen observed "stop lights" only.[8]   ECF No. 79-6

(Chen Dep. 56:9 - 58:4); ECF No. 83-3 (Chen Dep. 56:9 - 58:4).   There came a point when Mr.

Chen realized he could not stop in time without striking any of the vehicles.

> Q:      What did you decide to do when you realized that?

> A:      When I realize there were two cars stopped in front of my
> [bus], I couldn't make it stop before my [bus] hit the vehicle in
> front of me.   So I put the steering wheel towards the right side a
> little bit.

> Q:      Then what happened?

> A:      Then I stopped.

> Q:      Did you hit any of the vehicles?

> A:      I'm not sure.

ECF No. 79-6 (Chen Dep. 61:7-18); ECF No. 83-3 (Chen Dep. 61:7-18).

Between the time Mr. Chen first observed the cars stopped in front of the bus and the

time the bus collided with those vehicles, Mr. Chen never saw a pedestrian in the roadway.[9]

ECF No. 79-6 (Chen Dep. 60:3-5); ECF No. 83-3 (Chen Dep. 60:3-5).

This accident occurred on the ramp to New York Avenue from southbound Baltimore

Washington Parkway in the area where the Kenilworth Avenue ramp comes into the Baltimore

Washington Parkway.   Because the Baltimore Washington Parkway falls under the territorial

---

[8]   Mr. Chen testified through a Mandarin Interpreter.   It is not clear to the Court what Mr. Chen means by a "stop light" versus a "brake light."   Mr. Chen claims he did not see any "emergency lights" which the Court assumes he means "hazard lights" which flash.   "Only the stop light.   When the car stop, you see the light stop -- I mean, you see the light for stop.   Not the brake light, not the emergency light, or not -- nothing else.   When this car stop, because there's something behind the car, so it was blocking.   We couldn't see anything."   ECF No. 79-6 (Chen Dep. 56:21 - 57:6); ECF No. 83-3 (Chen Dep. 56:21 - 57:6).

[9]   Plaintiffs acknowledge there is no *direct* evidence as to where Mr. Gamez was standing at the time he was struck.   *See* ECF No. 83 at 14.   None of the drivers of the other vehicles – Mr. Diriba, Mr. Peters and Mr. Chen – saw a pedestrian in the roadway.   Nevertheless, Plaintiffs assert Mr. Gamez was "standing on the passenger side *away from the roadway beside his Frontier*" when he was struck by the bus.   *Id.* at 8 (emphasis added).   *Nowhere* in the U.S. Park Police Supplemental Criminal Incident Record is there a statement identifying Mr. Gamez stood where Plaintiffs claim.

jurisdiction of the United States Department of the Interior, the United States Park Police responded to the scene of the accident and conducted the investigation. Officer Kenneth Bentivenga ("Officer Bentivenga") was tasked with crash reconstruction. By the time Officer Bentivenga arrived at the crash scene, Mr. Gamez's body had been removed. Officer Bentivenga was told "[Mr. Gamez's] body was recovered with his lower body under the bus just forward of the first rear axle on the driver's side with the upper body just south of [the Nissan Frontier pickup truck]." ECF No. 79-4 (Bentivenga Dep. 46:4-8).

The crash reconstruction revealed that three drivers (Mr. Diriba operating the Nissan Sentra, Mr. Peters operating the Volkswagen Golf and Mr. Chen operating the Van Hool Tour Bus) each came to a controlled stop, meaning that each driver was in control of his vehicle when it was brought to a stop. *Id.,* (Bentivenga Dep. 44:11 – 45:7). Officer Bentivenga did not see any tire marks on the surface of the roadway at the accident site. This fact indicated to him "that there was no evidence of hard braking, hard enough to produce tire marks." *Id.*, (Bentivenga Dep. 45:13-15).

## **JURISDICTION AND VENUE**

Subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a). Plaintiff Rhina Saravia and Plaintiff Rosa Maria Gamez are citizens of the District of Columbia and Phillip R. Murray, Esquire, the Personal Representative of the Decedent's Estate, is in Maryland. Defendant De Yue Chen is a resident of the State of New York. Defendant New Century Travel, Inc. is a Pennsylvania corporation licensed to conduct business in the District of Columbia. The amount in controversy exceeds $75,000.

Pursuant to 28 U.S.C. § 1391 venue is proper in this district because a substantial part of the events giving rise to the claim occurred in this district. The Court notes Defendant New

Century Travel, Inc. removed this case, first from the Superior Court of the District of Columbia to the United States District Court for the District of Columbia, *see* ECF No. 1, and after the case was removed, petitioned to have venue transferred from the United States District Court for the District of Columbia to this District, s*ee* ECF Nos. 2, 5.

## **STANDARD OF REVIEW**

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(a); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)) (formerly Fed. R. Civ. P. 56(c)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 323.  On those issues

where the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256.  However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'"  *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)).  There must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

## DISCUSSION

Before addressing the parties' positions regarding genuine issues as to any material fact, the Court must address some preliminary matters.  Since this Court's jurisdiction is based on diversity of citizenship, the principles outlined in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) require the application of Maryland law to substantive law questions.  Under Maryland law, in pleading a cause of action for negligence, "a plaintiff must 'allege with certainty and definiteness, facts and circumstances sufficient to set forth (a) a *duty* owed by the defendant to the plaintiff, (b) a *breach* of that duty and (c) injury *proximately* resulting from that breach.'" *Pace v. State*, 425 Md. 145, 154, 38 A.3d 418, 423 (2012) (quoting *Pendleton v. State*, 398 Md. 447, 458, 921 A.2d 196, 202-03 (2007) (emphasis in original) (quoting *Scott v. Jenkins*, 345 Md. 21, 28, 690 A.2d 1000, 1003 (1997)).

In Maryland contributory negligence ordinarily bars any recovery by a plaintiff.  *Board of County Commissioners of Garrett County v. Bell Atlantic-Maryland, Inc.*, 346 Md. 160, 180, 695 A.2d 171, 181 (1997).  A defendant has the burden of establishing this defense.  The Court of

Appeals of Maryland has adopted the Restatement (Second) of Tort §463's definition of contributory negligence.

> Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm.

*Kassama v. Magat*, 368 Md. 113, 127, 792 A.2d 1102, 1110 (2002) (quoting *Craig v. Greenbelt Consumer Servs.*, 224 Md. 95, 97, 222 A.2d 836, 837 (1966)).

"Standard" mentioned in the above definition refers to a reasonable person standard of care. "[I]n measuring contributory negligence, the standard of care imposed on a person for his or her own protection is that of a reasonable person under like circumstances, and that a reasonable person's conduct 'is to be judged in the light of all the relevant knowledge which the person actually then had.'" *Id.*, 792 A.2d at 1110 (quoting *Craig*, 244 Md. at 97, 222 A.2d at 837). The focus of the contributory negligence defense "'is whether the plaintiff took appropriate precautions to protect his [or her] own interests.'" *Id.*, 792 A.2d at 1110 (quoting *Wegad v. Howard Street Jewelers*, 326 Md. 409, 417, 605 A.2d 123, 127 (1992)).

In general, the issue of contributory negligence is a question for a jury (a) where there is conflicting evidence as to material facts relied upon to establish contributory negligence, or (b) where more than one reasonable inference can be drawn from the conflicting evidence. *See Baltimore Gas & Elec. v. Flippo*, 348 Md. 680, 703, 705 A.2d 1144, 1155 (1998). Contributory negligence however can be established as a matter of law when the evidence shows "some prominent and decisive act which directly contributed to the accident and which was of such character as to leave no room for difference of opinion thereon by reasonable minds." *Id.*, 705 A.2d at 1155 (quoting *Reiser v. Abramson*, 264 Md. 372, 378, 286 A.2d 91, 93 (1972)). Defendants contend Mr. Gamez's actions of stopping his pickup truck in the middle of a

14

highway, in an unlit area, then getting out of the truck and walking to the rear of the truck to secure the propane grill were prominent and decisive, directly contributing to the accident and no reasonable mind would differ on Mr. Gamez's ill-advised conduct under the circumstances. Contrarily, Plaintiffs argue Mr. Gamez made an emergency stop because the propane grill created a hazard for other drivers and thus he took action to make the roadway safe.  Even if Mr. Gamez was contributorily negligent, Plaintiffs assert the bus driver, Mr. Chen, had the last clear chance to avoid injuring Mr. Gamez.  Despite having such an opportunity to avoid the collision, Mr. Chen did not and thus he and his co-Defendant are liable.

A.      *Negligence: Violation of a Statute*

Defendants argue Mr. Gamez's contributory negligence can be established through his violation of several motor vehicle laws.  Either singly or in combination, these violations, Defendants assert, were the proximate cause of Mr. Gamez's fatal injury.  Contrarily, Plaintiffs claim the purported violations of certain statutes do not establish Mr. Gamez's contributory negligence and further contend Mr. Gamez's actions were reasonable under the circumstances and in accordance with certain other motor vehicle laws.

1.      *Failure to Secure Load*

Maryland Annotated Code, Transportation §24-106(c) states,

> A vehicle with any load may not be driven on any highway unless the load and any covering on the load are fastened securely to prevent the load or covering from becoming loose or detached or from in any way endangering other users of the highway.

It is undisputed that Mr. Gamez's failure to fasten securely the propane grill to his pickup truck started the sequence of events which ultimately resulted in his death.  Plaintiffs retained Gregory M. Manning, of Greg Manning Associates, as an expert in automotive accident reconstruction.

Mr. Manning was a Maryland State Police trooper for 10 years.   Mr. Manning testified Mr.

Gamez's insecure load would have warranted a traffic citation.

> Q:      You said that, if you had been a trooper on patrol and you
> saw Mr. Gamez driving down the way, in your opinion, he had this
> grill attached to his truck, you would have pulled him over.
>
> A:      Absolutely.
>
> Q:      Why?
>
> A:      Because Section 245 of the motor vehicle code provides all
> the laws for the securing of loads.   And that would have been a
> definite violation of Section 24 of the motor vehicle codes.
>
>         And I would have looked up Section 24.   I'd have found
> out the one for insecure load, and I'd have given him a ticket.   And
> I would not have let him drive the rest of the way to where he was
> going unless I helped him put -- if I was in a good mood that night,
> I might have helped him put it into the bed.   But that was rare.

ECF No. 79-8 (Manning Dep. 73:19 - 74:14); ECF No. 83-5 (Manning Dep. 73:19 - 74:14).

Defendants contend Mr. Gamez's failure to secure the grill properly in the bed of the

truck is a manifest violation of the Maryland Transportation Act and evidence of negligence *per*

*se*.   Although the circumstances of securing the grill to the pickup truck are unknown, what is

undisputed is yellow rope was used to secure the grill.   This rope is visible in the photographs

taken by the U.S. Park Police after the fatal collision.   Moreover, Plaintiffs' own expert opines

the use of rope to secure the grill was ineffective.   "You don't tie something -- you never tie

anything to a moving vehicle with a moving vehicle with rope, never."   ECF No. 79-8 (Manning

Dep. 73:16-18); ECF No. 83-5 (Manning Dep. 73:16-18).   During his examination of the crash

site,   Officer Bentivenga noted, "[a] propane grill was tied to the rear tailgate of [the Nissan

pickup truck] with a yellow rope, with the grill outside the truck bed area."   ECF No. 79-2 at 12;

ECF No. 83-1 at 3.   If Mr. Gamez had secured the propane grill in accordance with §24-106(c),

Defendants contend Mr. Gamez would not have compromised his safety and the safety of other motorists along the Baltimore Washington Parkway by stopping his truck in the middle of the road and then exiting his truck.

In their Opposition Plaintiffs assert Mr. Gamez's alleged violation of §24-106(c) does not constitute negligence *per se* because the violation was neither a proximate cause nor a concurrent cause of Mr. Gamez's injury.  Plaintiffs argue Defendants must show:  "(a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of."  *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 79, 835 A.2d 616, 621 (2003).  Even if Plaintiffs assumed Mr. Gamez failed to secure the grill in the pickup truck, it is not a reasonably foreseeable, natural and probable consequence of violating §24-106(c) that a bus would crash into Mr. Gamez. "Although an injury might have not occurred 'but for' an antecedent act, if the negligence of one person is merely passive, and potential, while the negligence of another is the moving and effective cause of the injury, the latter is the proximate cause and fixes the liability."  ECF No. 83 at 21 (citations omitted).  Plaintiffs thus claim Mr. Chen's highly negligent and reckless conduct is the effective cause of the injury while Mr. Gamez's violation of a statute is merely passive.

In their Reply Defendants argue the evidence clearly establishes that Mr. Gamez's "initial failure to secure the grill, in violation of MD. ANN. CODE, TRANSPORTATION § 24-106(c) was but one of [Mr. Gamez's] several negligent acts which set in motion a sequence of events which ultimately led to his death."  ECF No. 87 at 9.  Defendants reject Plaintiffs' effort to character Mr. Gamez's statutory violation as merely passive.

The Court finds the apparent purpose of Transportation Article §24-106(c) is to ensure debris from loads do not become hazards or projectiles which may endanger the safety of motorists on the highway.  The insecure propane grill embedded in the back of Mr. Gamez's pickup truck ultimately became such a hazard.

To prove negligence *per se*, proximate cause must be shown.  "Proximate cause is established by determining whether the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent. . . .  It is the existence of this cause and effect relationship that makes the violation of a statute *prima facie* evidence of negligence."  *Brooks*, 378 Md. at 79, 834 A.2d at 621 (quoting *Brown v. Dermer*, 357 Md. 344, 359, 744 A.2d 47, 55 (2000)).  Mr. Gamez is within the class of persons (motorists) to be protected and the ultimate harm suffered is the kind of harm the Maryland General Assembly intended to prevent.  Negligence which proximately causes an injury need not be restricted to a singular cause.  *Atlantic Mut. Ins. Co. v. Kenney*, 323 Md. 116, 127, 591 A.2d 507, 512 (1991).  In other words, more than one negligent act may proximately cause an injury. "In order to be a proximate cause, the negligence must be 1) a cause in fact, and 2) a legally cognizable cause."  *Id.*  "The violation of a statute may furnish evidence of negligence, but only where the person alleging the negligence is within the class of persons sought to be protected, and the harm suffered is of the kind which the statute was intended, in general, to prevent."  *Id.* at 124, 591 A.2d at 510-11 (citation omitted).  This Court finds this statutory violation of Transportation Article §24-106(c) by Mr. Gamez was one of the causes proximately resulting in his death.

2. *Parking on the Roadway*

Maryland Annotated Code, Transportation §21-1001(a) states,

> Except as otherwise provided in this section, on any highway
> outside of a business district or a residential district, a person may
> not stop, park, or leave standing on the roadway any vehicle,
> whether attended or unattended, if it is practicable to stop, park, or
> leave the vehicle standing off the roadway.

There is an exception to the above rule. The prohibition is not applicable when a vehicle becomes "unintentionally so disabled while on the roadway that [the driver] cannot avoid stopping and temporarily leaving it there." Md. Code. Ann., Transp. §21-1001(d). In their memorandum in support of their motion, Defendants note that the Court of Appeals of Maryland has signaled what constitutes a vehicle becoming unintentionally so disabled and what does not. The rapid accumulation of ice and snow on a windshield does not qualify as an exception under §21-1001(d). However, where the hood of a plaintiff's car suddenly flies up, completely blocking the plaintiff's view, under these circumstances stopping a vehicle on the highway did not violate the statute. *See* ECF No. 79-1 at 17 (citing *Williamson Truck Lines, Inc. v. Benjamin*, 344 Md. 1, 9, 222 A.2d 375, 280 (1966)). Defendants contend the facts in this case are distinguishable from *Williamson Truck*. First, the grill bouncing or falling out of Mr. Gamez's truck did not obstruct Mr. Gamez's line of sight. Second, Mr. Gamez did not stop immediately after the propane grill left gouge marks on the roadway or even after parts of the grill fell to the roadway. It is undisputed that the gouge marks are on the roadway some distance away north of the collision site and the grill parts subsequently fell to the ground north of the collision site as depicted in Officer Bentivenga's scaled diagram. *See* ECF No. 79-12; ECF No. 83-1 at 12. Defendants argue the gouge marks and the grill parts demonstrate Mr. Gamez drove for some time after the propane grill first became insecure and further shows Mr. Gamez had the capacity to drive to a safe location off of the highway. Third, as noted in the U.S. Park Police

Supplemental Criminal Incident Record,[10] there were a few areas Mr. Gamez could have utilized instead of stopping in the middle of the right southbound lane.   Based on the evidence, Mr. Gamez violated §21-1001(a) by stopping in the middle of the highway.

In their Opposition Plaintiffs claim Mr. Gamez did not violate §21-1001(a) because his car was disabled under §21-1001(d).   Plaintiffs assert Mr. Gamez's situation is analogous to the *Williamson Truck* case.   "Mr. Gamez's grill dragging behind his car posed a sudden and unexpected threat to himself and others which did not preclude operation of his vehicle but made it obviously impractical at the time."   ECF No. 83 at 23.   These factors made Mr. Gamez's vehicle "disabled" and thus parking his truck in the center of the right lane was completely lawful.   *Id.* at 24.   In the alternative, if parking the truck in the center of the right lane constituted a violation, Mr. Gamez's action was justified pursuant to Maryland Annotated Code, Transportation §24-106(e), securing loads on vehicles, which states,

> The owner of a vehicle from which dirt, debris, or agricultural products has fallen on any highway is responsible for removing that dirt, debris, or agricultural products within a reasonable time.

Plaintiffs contend it can be reasonably inferred that Mr. Gamez stopped on the roadway to comply with this provision.   "The danger of a large steel grill obstructing the highway is readily apparent, and removing such debris or preventing it from becoming a hazard to other motorists certainly justifies any violations of §21-1001(a)."   ECF No. 83 at 24-25.   Plaintiffs assert there are disputed issues of fact and law.   Therefore, these unresolved questions concerning Mr. Gamez's alleged contributory negligence must be resolved by a jury.

---

[10] Q:  Why would there be a criminal investigation regarding an incident such as this?
   A:  It is our standard practice whenever we have a fatality we handle them as criminal incidents.

ECF No79-4 (Bentivenga Dep. 107:16-19).

In their Reply Defendants argue, "[i]n light of the fact that [Mr. Gamez] kept driving for more than 400 feet after the grill first made contact with the roadway, Plaintiffs still attempt to argue that the vehicle became **suddenly** disabled."  ECF No. 87 at 11.  Defendants note "Officer Bentivenga's scaled diagram clearly shows that at the spot where the grill hit the roadway the grassy median strip was to [Mr. Gamez's] left and the channelization area was immediately to his right."  *Id.*  At some distance after the grill made contact with the roadway, debris fell from the propane grill to the ground.  Mr. Gamez did not pull off the road within the first 5 or 10 feet of debris falling off of the propane grill.  He continued to drive.  The evidence shows Mr. Gamez's truck was not disabled under §21-1001(d).

In the *Williamson Truck* case, as the plaintiff drove uphill, the hood of his automobile suddenly flew up and buckled toward the windshield, without any prior warning, obstructing Mr. Benjamin's vision.  Mr. Benjamin slowly stopped the car in the right lane, close to the shoulder. He set the emergency brake and began to work on lowering and securing the hood.  Mr. Benjamin's car was subsequently struck by a tractor-trailer.  The Court of Appeals of Maryland found Mr. Benjamin was faced with a sudden and unexpected emergency.

This Court finds the facts and circumstances in this case are not analogous to *Williamson Truck*.  First, Mr. Gamez's vision of the road was not obstructed.  Second, the stop by Mr. Gamez in the middle of the right southbound lane of the Baltimore Washington Parkway was not a sudden and unexpected emergency.  If Mr. Gamez had stopped his pickup truck and moved to a safe area either after the grill hit the roadway and left gouge marks or after pieces of the grill fell to the roadway, he would be responding to a sudden and unexpected event.  But Mr. Gamez continued to travel along the parkway.  Third, Mr. Gamez's pickup truck was not disabled. There is no evidence of any mechanical problems with the pickup truck.  The issue was the load,

*i.e.,* the propane grill, becoming insecure.  Thus §21-1001(d) does not exempt Mr. Gamez from the prohibition of §21-1001(a).  Fourth, the Court finds, contrary to Plaintiffs' assertion, that it is not reasonable to infer that Mr. Gamez stopped on the Baltimore Washington Parkway to remove debris from the roadway in order to comply with §24-106(e).  If Mr. Gamez had stopped in a safe area, off the highway, within 5 or 10 feet after the pieces from the propane grill fell to the ground, the Plaintiffs' assertion would be a reasonable inference because the effort to remove would have occurred "within a reasonable time" as mandated by §24-106(e).  The Court finds the more reasonable inference from Mr. Gamez's action is that he stopped his pickup truck to re-secure the propane grill in the truck.  Fifth, because Mr. Gamez's pickup truck was not mechanically disabled, he should have maneuvered his pickup truck to a safe area off the highway and then exit the pickup truck to re-secure the propane grill.  Plaintiffs' own expert acknowledged that there was an area nearby that Mr. Gamez could have moved to in order to address the unstable propane grill.

> Q:     Were there safer areas -- in the general area where Mr. Gamez stopped his truck, were there safer areas that he could have utilized to check his load?
>
> A:     He could have pulled into that channelization area.[11]

ECF No. 79-8 (Manning Dep. 77:3-8); ECF No. 83-5 (Manning Dep. 77:3-8).

Mr. Manning's opinion is consistent with the opinion of Officer Bentivenga.  During his deposition Officer Bentivenga noted Mr. Gamez could have moved his pickup truck from the travel portion of the roadway.

---

[11]  In his report Officer Bentivenga uses the phrase "a white line safety area."  According to Mr. Manning, that is the incorrect phrase for this area.  The proper terminology is "painted channelization area."  When asked to explain why he uses the latter term, Mr. Manning stated, "Because that's what it is.  If you look in the manual of uniform traffic-control devices, they don't call that a safety area.  They call it painted channelization."  ECF No. 79-8 (Manning Dep. 37:15-18); ECF No. 83-5 (Manning Dep. 37:15-18).

Q:      And what was your second opinion?

A:      Gamez stopped in the roadway instead of utilizing -- excuse me -- utilizing the safety zone[12] that separates the ramp to New York Avenue and the ramp from Kenilworth Avenue, or the wide portion of the grassy shoulder on the left side of the roadway.

Q:      Can you describe what you are describing when you say the grassy shoulder on the left side of the roadway?

A:      There is a wide area.

        I'm sorry.  I am trying to figure out a way that doesn't repeat what I just read.

        There is a grassy area if you are headed south on that ramp to the left of the roadway, which is for the most part flat, grassy and wide enough to accommodate several vehicles.

ECF No. 79-4 (Bentivenga Dep. 69:12 - 70:5).

Because Mr. Gamez's pickup truck was not mechanically disabled and because Mr. Gamez could have moved to a non-travel portion of the parkway, by stopping in the middle of the right southbound lane of the Baltimore Washington Parkway, in an area where the street lights were not functioning, even though he turned on his hazard lights upon stopping the pickup truck, Mr. Gamez violated Transportation §21-1001(a).  "[T]he violation of a statutory regulation

---

[12]  The identification of the "safety zone" was clarified during Officer Bentivenga's deposition.

Q:  In between the ramp from Kenilworth and the right lane of the Southbound Baltimore Washington Parkway there is an area separating those two; is that correct?
A:  Yes, sir.
Q:  In fact the bus stopped pretty much inside that area separating the ramp from Kenilworth and the Parkway?
A:  For the most part, yes, sir.
Q:  I have always heard that termed to be a gore area.
    Are you familiar with that term at all?
A:  There are lots of different terminologies.  That is why I tried to define it and then use parentheses.  I try to use common language in my report that people can understand, as opposed to technical terms.
    I termed it as a safety area and tried to explain in my report exactly as you previously described what it was to let people understand that is not a travel portion of the roadway.

ECF No. 79-4 (Bentivenga Dep. 36:19 - 37:17).

is evidence of negligence, and if such violation causes or contributes to the injuries complained of it constitutes negligence." *Ford v. Bradford*, 213 Md. 534, 541, 132 A.2d 488, 491-92 (1957). It is apparent that the intent of the Maryland General Assembly in passing the law prohibiting vehicles from stopping, parking or standing on the roadway is to prevent motor vehicle accidents and the concomitant injuries and/or fatalities.  "Foreseeability as an element of proximate cause permits a retrospective consideration of the total facts of the occurrence, including the criminal acts of a third person occurring after the original act of negligence of a tortfeasor."  *Kenney*, 323 Md. at 132, 591 A.2d at 515.  The Court finds this statutory violation by Mr. Gamez was one of the causes proximately resulting in his death.

> 3.    *Alighting from Stopped Vehicle & Walking to Rear of Pickup Truck*

There is no dispute that Mr. Gamez was struck while he stood outside of his pickup truck. In conducting the crash reconstruction Officer Bentivenga determined where Mr. Gamez was standing.

> Q:     Was there a determination made by either Detective Daniels or by you yourself precisely where Mr. Gamez was on the roadway when he was struck?
>
> A:     There was a determination made by myself as to the approximate location of where he was standing when he was struck.
>
> Q:     Okay.
>
>        And can you give us some parameters of what you mean by the approximate location?
>
> A:     I will not pinpoint it down to an inch, but I will say within certainly a foot or two of where I said he was standing.
>
> Q:     And where was that?
>
> A:     At the rear passenger side of his vehicle.

&ast;     &ast;     &ast;

Q: And do you know where Mr. Gamez was when he was struck in relation to his pickup truck?

A: Yes.

He was standing my best guess would be very close to the rear passenger's side of his vehicle.

Q: And what do you base that on?

A: The damage done to his truck was not indicative of metal on metal contact.  It was there was some brush marks, there was denting, there was cracking of the passenger side taillight assembly, which obviously showed some kind of an impact had occurred, but not metal on metal.

So, no vehicle hit his vehicle.  No other vehicle.  [Nissan Sentra, the bus or Volkswagen Golf] I believe it was.  None of the other vehicles hit his vehicle, the implication being that one of them pushed him into his own vehicle which caused the damage to his [truck].

ECF No. 79-4 (Bentivenga Dep. 28:8-21, 31:9-32:3).

Therefore, at the time of the fatal collision, Mr. Gamez was a *pedestrian* in accordance with Maryland Annotated Code, Transportation §11-145, because he was "an individual afoot." The Court of Special Appeals of Maryland defined "pedestrian" in relation to the state's motor vehicle laws.  "In the context of the motor vehicle laws, a pedestrian is a person on foot, as distinguished from one in or on a vehicle, on or near a public highway or other place where the motor vehicle laws apply."  *Braswell v. Burrus*, 13 Md. App. 513, 517, 284 A.2d 41, 43 (1971). The distinction between a motorist and a pedestrian has been clarified by case law.  In *Domeski v. Atlantic Refining Company*, 202 Md. 562, 567, 97 A.2d 313, 316 (1953), the Court of Appeals of Maryland found that a motorcycle rider who got off his motorcycle to push his vehicle across a highway is a pedestrian.  In *Braswell* the plaintiff was among a few individuals pushing a

disabled car onto the highway.   While this car was being pushed, the defendant was driving along the road and hit the disabled car as well as the plaintiff.   The Court of Special Appeals found the plaintiff was a pedestrian.   However, in the case of *Moon v. Weeks*, 25 Md. App. 322, 333 n.10, 333 A.2d 635, 642 n.10 (1975), the Court of Special Appeals found a child is not a pedestrian if the child is on a sled as it enters into the street.   Similarly, in *Wooldridge v. Price*, 184 Md. App. 451, 966 A.2d 955 (2009), the Court of Special Appeals found a man who was riding his skateboard when he rolled into the street and was struck by a car is not a pedestrian. "[T]he world of drivers is not limited to those who are driving cars, trucks, or other devices commonly known as vehicles; it includes those who are moving or in physical control of any device that meets the definition of 'vehicle.'"   *Id.* at 460, 966 A.2d at 960.   The facts are undisputed that Mr. Gamez was not inside his pickup truck when he was struck.   Based on the crash reconstruction conducted by Officer Bentivenga, Mr. Gamez was a passenger at the time he was struck because he was standing at the rear passenger side of his pickup truck in the middle of the right southbound lane of the Baltimore Washington Parkway.

In their motion Defendants cite Maryland Annotated Code, Transportation §21-503(a) for the proposition that "the pedestrian shall yield the right-of-way to any vehicle approaching on the roadway."   In their Opposition Plaintiffs challenge Defendants' citation to this law which governs pedestrians crossing at locations other than crosswalks.   "Mr. Gamez was neither crossing nor attempting to cross the roadway.   Rather, he was attempting to re-secure his truck's load."   ECF No. 83 at 13.   In their Reply Defendants cite Maryland Annotated Code, Transportation §21-509 for the proposition that a pedestrian may not walk on a controlled access highway.   Mr. Gamez, when he walked to the rear of his stopped pickup truck, was walking on the Baltimore Washington Parkway, a controlled access highway.

The Court finds §21-509(b)[13], as opposed to §21-503(a), is applicable to the facts and circumstances of this case.  Under Maryland's motor vehicle laws both drivers and pedestrians must exercise due care.  "[T]he driver of a vehicle shall exercise due care to avoid colliding with any pedestrian."  Md. Code Ann., Transp. §21-504(a).  Maryland law does not presume a pedestrian will be standing in the middle of a highway, as Mr. Gamez was in this case. Maryland law imposes a duty of care on pedestrians at crosswalks.  "A pedestrian may not suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impossible for the driver to yield."  *Id.* §21-502(b).  Because Mr. Gamez was standing in a place where motorists typically would not anticipate finding a pedestrian, Mr. Gamez was not relieved of the duty of keeping a careful lookout for other vehicles while he attempted to re-secure the propane grill in the back of his pickup truck.  *See Braswell*, 13 Md. App. at 517, 284 A.2d at 43.

> It is a general rule that an automobile driver must exercise towards others on the highway that degree of care which a person of ordinary prudence would exercise under similar circumstances. Likewise, a pedestrian must use such caution for his own safety as a person of ordinary prudence would exercise under similar circumstances.  Where a pedestrian is standing in a highway and does not notice the approach of an automobile, the driver should avoid striking him, if possible, by turning aside where there is ample room to pass the pedestrian in safety.  On the other hand, where a pedestrian sees an approaching automobile, and the traffic lane is so narrow that either he or the automobile must move outside of it in order that the automobile may pass, he ought to allow the car to proceed without turning aside and going around him.

*Domeski*, 202 Md. at 566-67, 97 A.2d at 315-16 (citations omitted).

It is undisputed that Mr. Gamez left a place of safety (as a driver of his functioning pickup truck) to a place of danger when he stopped his pickup truck along an unlit stretch of the

---

[13]  *Walking on highway.* – Except as provided in subsection (j) of this section, a pedestrian may not walk on a controlled access highway.

parkway, turned on his hazard lights, alighted from his pickup truck and walked to the rear passenger side of his truck.  Plaintiffs argue "[w]hen hit by Defendants' bus, Mr. Gamez was at the rear right of his vehicle facing away from traffic and was not obligated to turn and look for oncoming cars that should have reasonably been aware of his presence."   ECF No. 83 at 9. Plaintiffs are wrong.   Under Maryland law Mr. Gamez had a duty of keeping a careful watch for vehicles approaching from his rear since he placed himself in this perilous position.   Further, with regard to other drivers being aware of his presence, Mr. Gamez voluntarily stopped his pickup truck in an area where the overhead streetlights were not functioning.   As Officer Bentivenga testified, "[t]he more light the more somebody can see, the further away that they can see."  ECF No. 79-4 (Bentivenga Dep. 71:19-20).   With the streetlights inoperable in the area, drivers had challenges discerning clearly any disturbance at a distance.   The Court notes both Mr. Diriba and Mr. Peters initially perceived a vehicle/(vehicles) ahead was/(were) moving at a slower speed.   It was only as Mr. Diriba and Mr. Peters came closer to the disturbance did each realize his perception was incorrect.   The car(s) ahead was/(were) not slowing down, but actually stopped in the roadway.   Moreover it is undisputed that none of the drivers saw Mr. Gamez before the collision.   Thus, under these circumstances and contrary to Plaintiffs' contention, other drivers should *not* have been reasonably aware of Mr. Gamez's presence.   In conducting his crash reconstruction Officer Bentivenga determined Mr. Gamez's "place of danger" was a factor leading to the fatal collision.

> Q:     And then your last opinion is what?
>
> A:     Gamez exited his vehicle and was standing in the travel portion of the roadway, which was not lighted, where there was no expectation of the other drivers to predict a pedestrian in the roadway.

> In other words, there was no reasonable expectation for
> anybody to assume that there would be a person in the roadway at
> that time.

ECF No. 79-4 (Bentivenga Dep. 72:13-20).

Neither the Court nor the parties can state with any certainty what Mr. Gamez was thinking when he decided to stop in the area he selected.  Mr. Gamez unfortunately died as a result of the collision and thus is unable to testify on his behalf.  Under Maryland law there is a presumption that a decedent exercised due care with regard to his own safety.  *Bratton v. Smith*, 256 Md. 695, 703, 261 A.2d 777, 781 (1970).  Although this presumption exists, it is not absolute.  The presumption may be undermined or completely dissipated by evidence to the contrary.  *Id.* at 704, 261 A.2d at 782.

> When evidence of negligence on the part of the decedent is not
> legally sufficient to make contributory negligence a jury question,
> there is no need to instruct the jury about the presumption. . . On
> the other hand, if the evidence of contributory negligence is so
> conclusive as to require the entry of judgment for the defendant,
> the case will not go to the jury and jury instructions are not an
> issue.

*McQuay v. Schertle*, 126 Md. App. 556, 607-08, 730 A.2d 714, 742 (1999).

The evidence of record in this case not only undermines but virtually dissipates the presumption that Mr. Gamez exercised due care with regard to his own safety.  Based on the testimony of Mr. Diriba, there is evidence that Mr. Gamez had turned on the hazard lights of his pickup truck.  It is reasonable to infer from this action that Mr. Gamez was alerting other motorists that his vehicle was stopped both for his own safety and the safety of other motorists.  But Mr. Gamez's other actions undermine the presumption that he exercised due care with regard to his own safety.  "By stopping his vehicle in the travel lane of the highway, leaving the vehicle, walking in the roadway, and standing in the midst of through lanes of traffic, the actions

of Gamez evidence a deliberate and decisive departure from a place of safety into one that put

him in immediate peril." ECF No. 87 at 6. In addition, Mr. Gamez stopped his vehicle in an

area without operating streetlights. The Court finds a reasonably and ordinarily prudent person

would have foreseen or anticipated the likelihood of harm in stopping under these circumstances.

A reasonably and ordinarily prudent individual would have anticipated and guarded against

foreseeable danger by moving off the travel lane of the highway as quickly and as safely as

possible, in an area with better lighting and only then alighted from the vehicle to secure the

propane grill. As Plaintiffs' own expert acknowledged, "[i]f I was the trooper investigating [the

fatal collision], I would certainly have had the driver of the Nissan pickup truck as a primary

cause." ECF No. 79-8 (Manning Dep. 38:19-21); ECF No. 83-5 (Manning Dep. 38:19-21). The

Court finds Mr. Gamez was contributorily negligent.

B.      *Last Clear Chance Doctrine*

Plaintiffs contend, even if Mr. Gamez was contributorily negligent, that Mr. Chen had a

fresh opportunity to avoid the accident but failed to and thus Mr. Chen's negligence overcomes

Mr. Gamez's contributory negligence. In support of their position Plaintiffs note the speed limit

was 45 miles per hour and that Mr. Chen was traveling at 65 miles per hour "immediately prior

to the accident." ECF No. 83 at 30. Plaintiffs also argue Mr. Chen's failure to keep a proper

lookout while driving is supported by the fact that both Mr. Diriba and Mr. Peters were able to

avoid striking Mr. Gamez and his pickup truck.

The last clear chance doctrine has been defined as follows: "'[t]he mere negligence or

want of ordinary caution on the part of the deceased . . . would not disentitle the plaintiff to

recover . . . if the defendant might, by the exercise of care on its part, have avoided the

consequences of the neglect or carelessness of the deceased.'" *Harrison v. Montgomery County*

*Bd. of Educ.*, 295 Md. 442, 450, 456 A.2d 894, 898 (1983) (quoting *N.C.R.R. Co. v. State, Use Price*, 29 Md. 420, 436 (1868)).   The last clear chance doctrine is a plaintiff's defense to a defendant's defense alleging the contributory negligence of plaintiff.   *Nationwide Mut. Ins. Co. v. Anderson,* 160 Md. App. 348, 356-57, 864 A.2d 201, 206 (2004), *cert. denied*, 386 Md. 181, 872 A.2d 46 (2005).   To assert the defense of last clear chance, a plaintiff must demonstrate a sequence of events, namely, (a) negligence of a defendant, (b) contributory negligence of a plaintiff, and (c) some new or independent event or happening which affords a defendant a fresh opportunity to avoid or avert the consequences of the defendant's original negligence and plaintiff's contributory negligence.   *Maryland Civil Pattern Jury Instruction* 19:4 (4th ed. & Supp. 2009).   For a plaintiff to recover under the doctrine of last clear chance, the plaintiff must demonstrate that his contributory negligence had ceased and that the defendant had an opportunity, not only to avoid his original negligence, but also the plaintiff's contributory negligence.   *Anderson*, 160 Md. App. at 355, 864 A.2d at 205.   "For the doctrine to apply, the acts of the respective parties must be sequential and not concurrent."   *Burdette v. Rockville Crane Rental*, 130 Md. App. 193, 216, 745 A.2d 457, 469 (2000).   "In other words, the defendant must have had a chance to avoid the injury after plaintiff's negligent action was put in motion."   *Carter v. Senate Masonry, Inc.*, 156 Md. App. 162, 168, 846 A.2d 50, 54 (2004).   The application of this defense is best illustrated by case law.

In *Ritter v. Portera*, 59 Md. App. 65, 474 A.2d 556 (1984), the plaintiff sat or was about to sit on the hood of the defendant's car.   The defendant then started the car, moving with great velocity.   All parties agreed the plaintiff was contributorily negligent.   The Court of Special Appeals of Maryland found the defendant (driver of the automobile) had a last clear chance to avoid the plaintiff's act of placing herself in "helpless peril" by refusing to move the vehicle

while she sat in a perilous position.   The evidence clearly shows that the defendant by the exercise of ordinary care had the last clear chance to avoid the accident.

Contrarily, in the *Anderson* case, the decedent, Jones was sixteen years old.   Clyburn, twenty-nine years old, drove his car to pick up Jones.   They spent time with others that night. Both Jones and Clyburn consumed several alcoholic drinks.   Jones asked Clyburn if she could drive his car and he obliged.   Jones did not have a driver's license and no previous driver training.   Along the stretch of a particular road, Jones was stopped at a red light.   When the light turned green, she began to race with a car in the lane next to her, lost control of Clyburn's car which spun and flipped over.   Jones was ejected from the car and died from her injuries.   Jones' personal representative claimed Clyburn was negligent by allowing an unlicensed, intoxicated and underage individual (Jones) to operate the car.   Her personal representative also asserted that Clyburn had the last clear chance to avoid the accident either by force or psychological influence.   The Court of Special Appeals disagreed.   The evidence clearly established Jones' contributory negligence. "Jones . . . was not the party in *helpless* peril because she was the only person in a position to prevent the tragic accident." *Anderson*, 160 Md. App. at 360, 864 A.2d at 208.   The Court observed that Clyburn was a passenger in the car as Jones drove and therefore was not in the position to avoid the danger.   Jones, as the driver, had committed the final negligent act which took her own life.

In this case Plaintiffs assert Mr. Chen had a fresh opportunity to avoid striking Mr. Gamez and thus was negligent because Mr. Chen was operating the bus at 65 miles per hour in an area where the maximum speed limit was 45 miles per hour.   Plaintiffs' expert, Mr. Manning, alludes to Mr. Chen traveling at 65 miles per hour *a football field away* but concedes Mr. Chen's speed was much lower at the point of impact.

Q:      You said [Mr. Chen] had to have seen the three cars.  What three cars would the bus driver have to have seen?

A:      The Volkswagen, the Nissan pickup truck and the Nissan that was behind it.

Q:      The Sentra?

A:      Excuse me?

Q:      The Sentra.

A:      Sentra.  He had to see all three of them.

Now, he would have seen the brake lights on the Volkswagen, because the Volkswagen was right in front of him. *He was reducing the speed the entire distance -- the bus driver was -- from 65 miles an hour down to about 22 miles an hour when he hit everybody.*

*                              *                              *

Q:      An additional conclusion from the park police that you did not mention when you were describing your conclusions was that speed of the bus was not a factor in the accident.  Do you agree with that?

A:      The officer didn't have the knowledge that I now have.

Q:      So then your response is?

A:      What the officer observed was he observed -- and if I had been a trooper out there, I would have said the same thing.  I think he's absolutely right, because he saw the aftermath.  He saw where the bus stopped relative to the cars.  And that certainly would indicate to an experienced law enforcement officer that *there was no speed involved*.

But he didn't know what the man was doing a football field away.

Q:      So is your answer then you do not agree with that conclusion?

A:      I agree with his conclusion based on what he could have possibly seen that night.

ECF No. 79-8 (Manning Dep. 40:13 – 51:5, 42:5 – 43:4) (emphasis added); ECF No. 83-5 (Manning Dep. 40:13 – 51:5, 42:5 – 43:4) (emphasis added).

Plaintiffs also argue that Mr. Chen failed to keep a proper lookout and if he had, Mr. Chen would have had the opportunity to avoid striking Mr. Gamez.  For purposes of this discussion the Court shall presume negligence by Mr. Chen by not keeping a proper lookout. Mr. Gamez was contributorily negligent for the reasons mentioned *supra*.  Plaintiffs have failed to identify some new event or happening, occurring after Mr. Gamez's contributory negligence, which would have given Mr. Chen a fresh opportunity to avert both his negligence and Mr. Gamez's contributory negligence.

Plaintiffs assert, by keeping a proper lookout, Mr. Chen, could have avoided striking Mr. Gamez similar to Mr. Diriba and Mr. Peters.  As noted previously, ***none of the drivers*** saw Mr. Gamez on the highway.  "[T]he Plaintiffs cannot avoid the fact that no one saw [Mr. Gamez] prior to the accident and that therefore no fresh opportunity to avoid hitting [Mr. Gamez] ever existed."  ECF No. 87 at 15.  Moreover, the area where Mr. Gamez's truck was stopped was not illuminated because the streetlights were not functioning.  This circumstance diminished **all** drivers' perceptions.  Both Mr. Diriba and Mr. Peters initially believed the vehicle/(vehicles) ahead of him was/(were) traveling slowly and later realized the vehicle/(vehicles) was/(were) actually stopped.  Mr. Peters had to *swerve* to the right to avoid colliding with Mr. Diriba's Nissan Sentra and the pickup truck.  Mr. Peters described his swerve as not slight but dramatic. *See* ECF No. 79-3 (Peters Dep. 28:13 – 29:1); ECF No. 83-2 (Peters Dep. 29:13 – 29:1).  Mr. Chen was faced with circumstances similar to Mr. Diriba and Mr. Peters but Mr. Chen was operating a much heavier vehicle.  When the bus Mr. Chen was operating struck Mr. Gamez, the Nissan Sentra and the Volkswagen Golf, Mr. Gamez's contributory negligence was *ongoing*.  It

had not ceased.  *Anderson*, 160 Md. App. at 355, 864 A.2d at 205.   Therefore Mr. Chen's assumed negligence of failing to keep a proper lookout and Mr. Gamez's contributory negligence were *concurrent* and not *sequential*.

The circumstances of this case are similar to *MacKenzie v. Reesey*, 235 Md. 391, 201 A.2d 848 (1964).  Reesey was driving his car within the posted speed limit.  He stopped at a traffic signal.  Once the light turned green, he continued to drive within the posted speed limit. About 517 feet from the intersection, he felt a thump on the car's left front side.  He promptly stopped in the same lane of traffic.  Upon exiting the car and walking back, he found the decedent lying on the road.  The decedent was a pedestrian who had recently exited a diner. Reesey did not see the decedent before the collision.  An eyewitness observed the decedent walking between crosswalks to the middle of the street and observed Reesey's vehicle strike the decedent.   The trial judge below found the decedent contributorily negligent because the decedent crossed a well-lighted street between the crosswalks but failed to avoid an automobile traveling a reasonable speed and being operated in an ordinary manner.  The Court of Appeals of Maryland determined that the doctrine of last clear chance was not applicable to these circumstances.  "[T]here was no showing of a chance on the part of [Reesey] to avoid the consequences of his (assumed) negligence and the decedent's contributory negligence."  235 Md. at 387, 201 A.2d at 851.  Similarly in this case Plaintiffs have failed to identify the "fresh opportunity" Mr. Chen had to avoid the consequences of his assumed negligence and Mr. Gamez's contributory negligence.   Although tragic, the circumstances in this case do not comport with the required elements of the doctrine of last clear chance.

## <u>CONCLUSION</u>

For the foregoing reasons the Court finds there are no genuine issues as to any material fact and the Defendants are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  An Order will be entered separately.

<u>October 2, 2012</u>　　　　　　　　　　　_____/s/_____
　　　　Date　　　　　　　　　　　　　　WILLIAM CONNELLY
　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE